1  BARRY J. PORTMAN
   Federal Public Defender
2  JODI LINKER
   Assistant Federal Public Defender
3  19th Floor Federal Building
   450 Golden Gate Avenue
4  San Francisco, CA 94102
   Telephone:  (415) 436-7700
5
   Counsel for Defendant ROMERO-ROMERO
6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,            )    No. CR-07-711 MMC
                                        )
11                                      )    **DEFENDANT ROMERO-ROMERO'S**
                      Plaintiff,        )    **MOTION AND MEMORANDUM OF**
12                                      )    **POINTS AND AUTHORITIES IN**
           v.                           )    **SUPPORT OF MOTION TO DISMISS**
13                                      )    **INDICTMENT ON GROUNDS THAT**
                                        )    **PRIOR DEPORTATION CANNOT**
14 OSCAR ERNESTO ROMERO-ROMERO,         )    **SERVE AS PREDICATE FOR ILLEGAL**
   JR.,                                 )    **REENTRY PROSECUTION**
15                                      )
                                        )    Hearing Date: July 30, 2008
16                    Defendant.        )    Time: 2:30 pm
   _____)    Court:  Hon. Maxine M. Chesney
17

18

19

20

21

22

23

24

25

26

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION ........................................................ 2

3   II.   STATEMENT OF FACTS ................................................ 3

4         A.    MR. ROMERO-ROMERO'S BACKGROUND .......................... 3

5         B.    MR. ROMERO-ROMERO'S REMOVAL FROM THE UNITED STATES .... 5

6   III.  ARGUMENT ........................................................ 10

7         A.    MR. ROMERO-ROMERO WAS DENIED DUE PROCESS IN HIS
               DEPORTATION PROCEEDING BECAUSE THE IJ CONSIDERED THE
8              WRONG LEGAL STANDARD AND HIS ATTORNEY PROVIDED
               INEFFECTIVE ASSISTANCE OF COUNSEL ........................ 10
9
          B.    ENTRY OF THE DEPORTATION ORDER AGAINST MR. ROMERO-
10             ROMERO WAS FUNDAMENTALLY UNFAIR (8 U.S.C. § 1326(D)(1)) .... 12

11             1.    Mr. Romero-Romero's Due Process Rights Were Violated by the Defects
                     in the Underlying Deportation Proceeding Because The IJ Considered The
12                   Wrong Legal Standard for Derivative Citizenship ................... 12

13             2.    Mr. Romero-Romero's Due Process Rights Were Also Violated by His
                     Attorney's Failure to Pursue His Derivative Citizenship Claim ....... 16
14
               3.    Mr. Romero-Romero Suffered Prejudice As a Result of These Defects . 20
15
          C.    AS MR. ROMERO-ROMERO WAS MIS-ADVISED BY THE IJ AND HIS
16             ATTORNEY, HIS WAIVER OF APPEAL WAS NOT KNOWING AND
               INTELLIGENT AND HE WAS DENIED THE OPPORTUNITY FOR
17             JUDICIAL REVIEW (8 U.S.C. § 1326(D)(1) AND (D)(2)) ................ 23

18             1.    If Mr. Romero-Romero Must Exhaust His Administration Remedies,
                     Because His Waiver of Appeal was Not Knowing and Intelligent, He is
19                   Deemed to Have Exhausted his Administrative Remedies .......... 23

20             2.    Mr. Romero-Romero Was Deprived of An Opportunity for Judicial
                     Review ...................................................... 24
21
    IV.   CONCLUSION ...................................................... 25
22

23

24

25

26

i

1

## **TABLE OF AUTHORITIES**

2

### **FEDERAL CASES**

3   *Castillo-Perez v. INS*, 212 F.3d 518 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4   *Castro-Nuno v. INS*, 577 F.2d 577 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5   *Dearinger v. Reno*, 232 F.3d 1042 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

6   *Duran v. INS*, 756 F.2d 1338 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7   *Getachew v. INS*, 25 F.3d 841 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8   *Hughes v. Ashcroft*, 255 F.3d 752 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9   *Lata v. INS*, 204 F.3d 1241 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10  *Lopez v. INS*, 184 F.3d 1097 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

11  *Lopez v. INS*, 775 F.2d 1015 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12  *Minasyan v. Gonzalez*, 401 F.3d 1069 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

13  *Ortiz v. INS*, 179 F.3d 1148 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

14  *Rivera v. Ashcroft*, 394 F.3d 1129 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

15  *Roe v. Flores-Ortega*, 120 S. Ct. 1029 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

16  *Singh v. Ashcroft*, 367 F.3d 1182 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 21

17  *United States v. Andrade-Partida*, 110 F. Supp. 2d 1260 (N.D. Cal. 2000) . . . . . . . . . 11, 16, 24

18  *United States v. Arce-Hernandez*, 163 F.3d 559 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 15

19  *United States v. Arrieta*, 224 F.3d 1076 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

20  *United States v. Barraza-Leon*, 575 F.2d 218 (9th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . 16

21  *United States v. Garcia-Martinez*, 228 F.3d 956 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 12

22  *United States v. Leon-Leon*, 35 F.3d 1428 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

23  *United States v. Lopez-Hernandez*, 2007 WL 608111 (N.D.Cal. 2007) . . . . . . . . . . . . . . . . . 11

24  *United States v. Lopez-Menera*, 542 F. Supp. 2d 1025 (N.D. Cal. 2008) . . . . . . . . . . . . . . . 11

25  *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 23

26  *United States v. Muro-Inclan*, 249 F.3d 1180 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 20, 23, 24

     *United States v. Pallares-Galan*, 359 F.3d 1088 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 11, 24

*United States v. Ubaldo-Figueroa*, 364 F.3d 1042 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . passim

**FEDERAL STATUTES & REGULATIONS**

8 U.S.C. § 1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

8 U.S.C. § 1432 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

8 U.S.C. § 1431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

8 C.F.R. § 242.17(a) (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

**MISCELLANEOUS**

Wible, Brent S., *The Strange Afterlife of Section 212(c) Relief: Collateral Attacks on Deportation Orders in Prosecutions for Illegal Reentry After St. Cyr*, 19 GEO. IMMIGR. L.J. 455, 475 (Summer 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

1   BARRY J. PORTMAN
    Federal Public Defender
2   JODI LINKER
    Assistant Federal Public Defender
3   19th Floor Federal Building
    450 Golden Gate Avenue
4   San Francisco, CA 94102
    Telephone: (415) 436-7700
5
    Counsel for Defendant ROMERO-ROMERO
6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,            )   No. CR-07-711 MMC
                                         )
11                      Plaintiff,       )   **DEFENDANT ROMERO-ROMERO'S**
                                         )   **MOTION AND MEMORANDUM OF**
12                                       )   **POINTS AND AUTHORITIES IN**
         v.                              )   **SUPPORT OF MOTION TO DISMISS**
13                                       )   **INDICTMENT ON GROUNDS THAT**
                                         )   **PRIOR DEPORTATION CANNOT**
14  OSCAR ERNESTO ROMERO-ROMERO,         )   **SERVE AS PREDICATE FOR ILLEGAL**
    JR.,                                 )   **REENTRY PROSECUTION**
15                                       )
                                         )   Hearing Date: July 30, 2008
16                      Defendant.       )   Time: 2:30 pm
    _____)   Court: Hon. Maxine M. Chesney
17

18       TO:    UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH
                RUSSONIELLO, UNITED STATES ATTORNEY, NORTHERN DISTRICT OF
19              CALIFORNIA; AND TAREK HELOU, ASSISTANT UNITED STATES
                ATTORNEY:
20
         PLEASE TAKE NOTICE that on July 2, 2008, at 10:00 a.m., before the Honorable
21
    Maxine M. Chesney, defendant Oscar Ernesto Romero-Romero, Jr. will move this Court to
22
    dismiss the indictment on the grounds that the prior deportation order was entered after
23
    constitutionally defective deportation proceedings and therefore cannot serve as a predicate for a
24
    prosecution under 8 U.S.C. § 1326.
25

26

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant Oscar Ernesto Romero-Romero, Jr. is charged in a one count indictment with a violation of 8 U.S.C. § 1326, illegal reentry after deportation.  The indictment against Mr. Romero-Romero should be dismissed on the grounds that his deportation in 2004, as a matter of law, cannot constitute the prior lawful deportation order necessary for the government to establish the deportation element of a violation of 8 U.S.C. § 1326.   Mr. Romero-Romero is a citizen of the United States and was at the time he was ordered deported in 2004.  Indeed, he derived citizenship from his mother in 1996 when she naturalized as a citizen of the United States.   Accordingly, the immigration judge's order of removal is fundamentally flawed as she had no authority to deport a citizen.  The IJ misconstrued the standard for derivative citizenship; had she applied the proper standard, Mr. Romero-Romero would not have been deported.

In addition, Mr. Romero-Romero's counsel, Timothy Myers, provided constitutionally ineffective assistance.  First, Mr. Myers completely failed to present Mr. Romero-Romero's derivative citizenship claim even though he had a strong claim for citizenship.  Second, Mr. Myers failed to undertake even the most minimal investigation to determine the status of Mr. Romero-Romero's parents' marriage.  Third, Mr. Myers failed to consider the proper standard for derivative citizenship and ignored evidence that would have established Mr. Romero-Romero's derivative citizenship.  Finally, Mr. Myers informed the immigration court, as well as Mr. Romero-Romero, that he had filed a petition to certify Mr. Romero-Romero's citizenship, when he had not done so.  The attorney's inaction with respect to each of these issues fell below a minimum standard of competence.  As a result, Mr. Romero-Romero stipulated to being removed from the United States and waived his right to appeal in reliance on the misleading information from the IJ and his counsel.  Had his counsel provided competent assistance, Mr. Romero-Romero would not have been deported from the United States because he was a citizen of the United States.

1    Under these circumstances, the underlying deportation order cannot serve as a predicate

2   for a prosecution for illegal reentry.  As the aforementioned deportation was Mr. Romero-

3   Romero's sole deportation or removal from the United States, this case presents an unusual

4   situation requiring that the indictment be dismissed.

5                          **II.    STATEMENT OF FACTS**

6   **A.    MR. ROMERO-ROMERO'S BACKGROUND**

7    Mr. Romero-Romero was born on May 11, 1980 in El Salvador.  *See* Declaration of

8   Sandra Evelyn Romero (hereinafter "Ms. Romero Decl"), attached to Declaration of Jodi Linker

9   Authenticating Documents (hereinafter "Linker Auth. Decl.") as Exhibit H.   His parents are

10  Sandra Evelyn Romero (hereinafter "Ms. Romero") and Oscar Ernesto Romero Ventura

11  (hereinafter "Mr. Ventura").  *Id*.  In 1983, at the age of three, Mr. Romero-Romero's family left

12  El Salvador to try to find a better life in the United States.  *Id*.  They moved to Los Angeles,

13  California near Ms. Romero's mother.  *Id*.  Mr. Romero-Romero's father worked as a truck

14  driver and his mother worked as a housekeeper.  *Id*.  On March 30, 1989, when he was eight

15  years old, Mr. Romero-Romero became a Lawful Permanent Resident (hereinafter "LPR") of the

16  United States.  *Id*.  He attended public school, and lived with his parents and four siblings, Hilda,

17  Sandra, Ernesto and Jancy.  *Id*.

18   Mr. Romero-Romero's parents were married on February 8, 1987; however, their

19  marriage was rocky from the start – they often fought and Mr. Ventura was physically abusive of

20  Ms. Romero.  *Id*.  Mr. Ventura soon began having an affair with another woman.  *Id*. &

21  Declaration of Oscar Ernesto Romero Ventura (hereinafter "Ventura Decl"), attached to the

22  Linker Auth. Decl. as Exhibit I.   On July 7, 1991, Mr. Ventura was caught attempting to

23  smuggle three undocumented individuals into the United States.  *See* In the Matter of Oscar

24  Ernest Romero-Ventura, Additional Charges of Deportability, dated September 13, 1991,

25  attached to the Linker Auth. Decl. as Exhibit A.  As the government alleged in the Charges of

26  Deportability against Mr. Ventura, one of those individuals was, Ada del Carmen Romero Torres

1   (hereinafter "Ms. Torres"), who was the woman with whom Mr. Ventura had been having an

2   affair.  *See* Ventura Decl, attached to the Linker Auth. Decl. as Exhibit I.  At that time, Ms.

3   Torres was already pregnant with Mr. Ventura's child, and he was trying to bring her into the

4   United States so that he could live with her and their soon-to-be-born child.  *Id*.

5        As a result of Mr. Ventura's conduct, he was ordered removed from the United States on

6   March 23, 1992, and was actually deported on May 14, 1992.  *See* Order of the Immigration

7   Judge In the Matter of Oscar Ernesto Romero Ventura, dated March 23, 1992, attached to Linker

8   Auth. Decl. as Exhibit B.  Ms.  Torres, however, remained in the United States and gave birth to

9   her and Mr. Ventura's daughter Tanya Venerise Romero on September 10, 1991 in Los Angeles,

10  California.

11       Mr. Ventura told Ms. Romero about his affair and that he was having a child with another

12  woman.  Ms. Romero was infuriated to learn this and, at that point, it was clear to her that their

13  marriage was over.  *See* Ventura Decl. & Ms. Romero Decl., attached to Linker Auth. Decl. as

14  Exhibits I & H.  They began and continued to live apart from one and other.  *Id*.  Accordingly, as

15  of Mr. Romero's deportation in 1992, there had been a final rupture in their marriage and neither

16  of them had any intention of continuing the marital relationship.  *Id*.  All of the children,

17  including the defendant, continued to live in the sole custody of their mother, Ms. Romero. *Id*.

18       On November 30, 1994, Ms. Romero filed an application for naturalization.  *See*

19  Application for Naturalization dated November 30, 1994, attached to Linker Auth. Decl. as

20  Exhibit C.  On that application, she was asked to check a box regarding her marital status and

21  was provided four options: (1) Single; (2) Married; (3) Divorced; or (4) Widowed.  *Id*.  As she

22  was still technically married, she truthfully indicated that on her application.  *See* Ms. Romero

23  Decl., attached to Linker Auth. Decl. as Exhibit H.    She also truthfully indicated on the

24  application that all of her children, except her daughter Sandra, were living with her at that time.

25  *See* Application for Naturalization dated November 30, 1994, attached to Linker Auth. Decl. as

26  Exhibit C.   On January 10, 1996, Ms. Romero was interviewed by an immigration official as

1  part of her naturalization application. *Id.* She truthfully answered all of the questions asked of

2  her. On May 30, 1996, when Mr. Romero-Romero was just 16 years-old, Ms. Romero became a

3  naturalized citizen of the United States. *See* Certificate of Naturalization dated May 30, 1996,

4  attached to Linker Auth. Decl. as Exhibit D.

5       Mr. Romero-Romero became a citizen of the United States at the time of his mother's

6  naturalization on May 30, 1996 under the law because: (1) he was under 18 years of age; (2) he

7  was unmarried; (3) he had been residing in the United States pursuant to a lawful admission for

8  permanent residence; and (4) his mother had legal custody of him after a legal separation of his

9  parents. *See* Immigration and Naturalization Act (hereinafter "INA") § 321(a); 8 U.S.C. § 1432

10 (1996).

11 **B.    MR. ROMERO-ROMERO'S REMOVAL FROM THE UNITED STATES**

12      On March 6, 2002, Mr. Romero-Romero was convicted of violating California Penal

13 Code § 288a(b)(1), oral copulation with a person under 18 and California Penal Code § 261.5(c),

14 statutory rape. While he was originally sentenced to three years of probation, he was found to

15 have violated the terms of his probation and was therefore sentenced to two years in custody.

16 Because of this conviction, the Immigration and Naturalization Service (hereinafter "INS") (now

17 "ICE") initiated removal proceedings against him on July 14, 2003. *See* Notice to Appear and

18 Warrant for Arrest dated July 14, 2003, attached to Linker Auth. Decl. as Exhibit E. The Notice

19 to Appear alleged that Mr. Romero-Romero was removable from the United States under INA §

20 237(a)(2)(A)(iii) for having been convicted of an aggravated felony, to wit, sexual abuse of a

21 minor. *Id.*

22      Mr. Romero-Romero then had six hearings regarding his removal. *See* Audio Recordings

23 of Immigration Proceedings and Related Transcriptions, attached to Linker Auth. Decl. as

24 Exhibits K & L. Each of his hearings was before Immigration Judge Rose Peters (hereinafter "IJ

25 Peters"). *Id.* At his first hearing on September 2, 2003, Mr. Romero-Romero was not

26 represented by counsel. Transcription of Immigration Hearing, Sept. 2, 2003, attached to Linker

Auth. Decl. as Exhibit L-1.  At that time, IJ Peters asked Mr. Romero-Romero several direct

questions relevant to his derivative citizenship and he answered each question truthfully and

succinctly as follows:

> IJ:     . . . Are you married?
> OR:    No, ma'am
> IJ:     Do you have children?
> OR:    No, ma'am.
> IJ:     Where is your mother?
> OR:    Uhh, living in Fontana, California.
> IJ:     And what's her immigration status?
> OR:    She's a U.S. citizen.
> IJ:     And she naturalized?
> OR:    Yes, ma'am.
> IJ:     When did she naturalize?
> OR:    1996.
> IJ:     And you were born May 11, 1980?
> OR:    Yes, ma'am.
> IJ:     And your mother's married to your father Oscar?
> OR:    Yes, ma'am.
> IJ:     What's his immigration status?
> OR:    Umm, he was dep . . . umm, he was a legal permanent resident but was deported.
> IJ:     In 1992?
> OR:    Yes, ma'am.
> IJ:     And he's back in the United States?
> OR:    No, ma'am.  I don't know.
> IJ:     I'm sorry?
> OR:    Umm, I don't know.
> IJ:     Is your mother still married to him?
> OR:    Yes.
> IJ:     I can't hear you.
> OR:    Yes, ma'am.

*Id*.  While IJ Peters asked whether his mother was "married to" his father, she never asked

whether they were separated at the time of his mother's naturalization.  Even after Mr. Romero-

Romero stated that he did not know whether his father was back in the United States after having

been deported 11 years prior, she did not inquire about the status of the parents' marriage beyond

asking whether they were still married.  From this colloquy, it is clear that IJ Peters was on notice

that Mr. Romero-Romero may have a claim to derivative citizenship because his mother had

naturalized when he was under 18 years of age and he had been a lawful permanent resident.  IJ

Peters, however, never mentions derivative citizenship to Mr. Romero-Romero nor does she

advise him of his potential eligibility for such status.

1        Prior to Mr. Romero-Romero's next hearing, his family hired an attorney to represent

2   him.  *See* Ms. Romero Decl., attached to Linker Auth. Decl. as Exhibit H.  Specifically, Ms.

3   Romero retained the Law Offices of Earl Carter, a law firm she understood to specialize in

4   immigration law.  *Id*.  At the next hearing on September 16, 2003, Timothy Myers from the Law

5   Offices of Earl Carter appeared on behalf of Mr. Romero-Romero.  Transcription of Immigration

6   Hearing, Sept. 16, 2003, attached to Linker Auth. Decl. as Exhibit L-2.  At that appearance, the

7   issue of Mr. Romero-Romero's derivative citizenship was explicitly raised by Mr. Myers who

8   informed IJ Peters that he was going to file an "N-600," the petition to certify Mr. Romero-

9   Romero's derivative citizenship, with the immigration service.  *Id*.  Mr. Myers explained that

10  when Ms. Romero naturalized, Mr. Romero-Romero was an LPR, under 18 years of age, in the

11  sole custody of his mother, and his father had been deported from the United States.  *Id*.

12       IJ Peters then inquired whether Mr. Romero-Romero's parents were divorced, even

13  though the derivative citizenship statute does not require an actual divorce.  *Id*.  She also then

14  incorrectly stated that she "explored this already with the respondent and it was his understanding

15  there was no legal separation so, without legal custody of the respondent, even though there's an

16  informal separation, that's not going to do the trick."  *Id*.  In fact, she had not done so, and had

17  only asked Mr. Romero-Romero whether his parents were still married; she never inquired

18  whether they were separated, nor did she inquire specifically about the status of the marriage

19  during the relevant time period, *i.e.,* when he was under 18 years of age.  Accordingly, while she

20  knew that his parents were married and not divorced, she certainly did not have sufficient

21  information to conclude that they were not legally separated under the statute, particularly given

22  Mr. Romero-Romero's comment that he did not know where his father was.

23       Later in the hearing, Mr. Myers informed IJ Peters:  "Also, I mean, we've got this N-600

24  we'd at least like to submit and see where they are going to go with it and have our evidence at

25  least looked at so that I can talk to mom, go through and see if there's any type of formal

26  separation filed or, so I don't know if two weeks is enough to even . . . ."  *Id*.  In fact, Mr. Myers

1   never talked to Mr. Romero's mom about whether she was separated from Mr. Ventura when she

2   naturalized. *See* Ms. Romero Decl., attached to Linker Auth. Decl. as Exhibit H.   Had he done

3   so, she would have informed him that they were separated at that time, and had been separated

4   since 1992. *Id*.  Nor did Mr. Myers discuss with her his belief that a formal court order of

5   separation was necessary. *Id*.  Had he done so, Ms. Romero would have filed the necessary court

6   documents to formally establish that she had separated from Mr. Ventura in 1992. *Id*.

7        At Mr. Romero-Romero's third immigration hearing on October 8, 2003, Mr. Myers

8   affirmatively informed the court at least twice that he had submitted an N-600 to the immigration

9   service for adjudication.  Transcription of Immigration Hearing, Oct. 8, 2003, attached to Linker

10  Auth. Decl. as Exhibit L-3.  When the IJ informed Mr. Myers that she could not proceed with the

11  removal hearing if Mr. Myers could establish that Mr. Romero-Romero even had a prima facie

12  case for derivative citizenship, Mr. Myers inaccurately informed the court that the evidence was

13  not available. *Id*.  Had Mr. Myers done the investigation he said he was going to do, he would

14  have learned that there was evidence of legal separation available – certainly enough evidence to

15  make out a prima facie case.  Ms. Romero was prepared to testify and present evidence that she

16  and Mr. Ventura had been separated in 1992, yet Mr. Myers had never asked her to do so, nor did

17  he inquire about any documentary evidence she may have to show that his parents had a final

18  rupture in the marital relationship in 1992.  Instead, Mr. Myers informed IJ Peters that because

19  they did not have any "court documents showing, uhh, divorce or legal separation from his

20  parents" he was not going to make his prima facie case. *Id*.

21       Despite Mr. Myers repeated statements to IJ Peters definitively informing her, the

22  government and his client that he had submitted an N-600 petition for derivative citizenship on

23  behalf of Mr. Romero-Romero to the immigration service, Mr. Myers never filed any such

24  petition.

25       At his fourth hearing on November 14, 2003, neither Mr. Myers nor anyone from his law

26  firm was present for Mr. Romero-Romero's scheduled hearing.  *See* Transcription of

1   Immigration Hearing, Nov. 14, 2003, Part I, attached to Linker Auth. Decl. as Exhibit L-4.1.  IJ

2   Peters continued the hearing to the afternoon, when she conducted his fifth hearing.

3   Transcription of Immigration Hearing, Nov. 14, 2003, Part II, attached to Linker Auth. Decl. as

4   Exhibit L-4.2.  At the later hearing, with only the excuse that a secretary had calendared the

5   hearing incorrectly, another attorney – not Mr. Myers – appeared for Mr. Romero-Romero.  *Id*.

6   No explanation was given for Mr. Myers' absence.  *Id.*  Mr. Romero-Romero's mother and older

7   sister were present in the court room and prepared for the hearing; however, because of the

8   attorney's tardiness, the hearing was continued to January 9, 2004.  *Id*.

9       At the final hearing on January 9, 2004, Mr. Myers re-appeared on behalf of Mr. Romero-

10   Romero.  Transcription of Immigration Hearing, Nov. 14, 2003, Part II, attached to Linker Auth.

11   Decl. as Exhibit L-5.  Present in the courtroom were Mr. Romero-Romero's mother, two older

12   sisters and younger brother.  *Id.*  At that time, Mr. Romero stipulated to his removal and IJ Peters

13   ordered him removed from the United States to El Salvador.  *See id.* & Order of the Immigration

14   Judge dated January 9, 2004 & Warrant of Removal/Deportation dated January 14, 2004,

15   attached to Linker Auth. Decl. as Exhibit F.

16       Mr. Romero-Romero stipulated to his removal and waived his appeal based on the

17   erroneous advise and information of his counsel and of IJ Peters.  *See* Declaration of Oscar

18   Ernesto Romero-Romero, Jr., attached to Linker Auth. Decl. as Exhibit G.  Mr. Myers informed

19   Mr. Romero-Romero that he had little chance of avoiding deportation at his hearing.  Mr. Myers

20   informed Mr. Romero-Romero that if he agreed to be deported, the N-600 that he had filed

21   would still be valid and under consideration by the immigration service and that he could wait to

22   learn the status of the N-600 after he had been deported, rather than wait in custody.   Mr.

23   Romero-Romero relied on this information in stipulating to removal and waiving his appeal.

24   ///

25   ///

26   ///

1

### III.    ARGUMENT

2

**A.    MR. ROMERO-ROMERO WAS DENIED DUE PROCESS IN HIS DEPORTATION PROCEEDING BECAUSE THE IJ CONSIDERED THE WRONG LEGAL STANDARD AND HIS ATTORNEY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL**

3

4

In general, in order to convict a defendant of violating 8 U.S.C. § 1326, illegal reentry

5

after deportation, the government must prove the following three elements beyond a reasonable

6

doubt: 1) the defendant is an alien; 2) the defendant was previously deported from the United

7

States; and 3) the defendant was found in the United States without the consent of the Attorney

8

General.  8 U.S.C. § 1326(a).  As such, a defendant's prior deportation is a predicate element for

9

a prosecution under 8 U.S.C. § 1326.  The United States Supreme Court has long established,

10

however, that a prior deportation order cannot serve as a predicate for a subsequent prosecution

11

under 8 U.S.C. § 1326 when the deportation proceedings giving rise to the order were

12

fundamentally flawed.  *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987).

13

The Supreme Court's holding is rooted in the Due Process Clause of the Constitution:  if

14

8 U.S.C. § 1326 "envisions that a court may impose a criminal penalty for reentry after *any*

15

deportation, regardless of how violative of the rights of the alien the deportation proceeding may

16

have been, the statute does not comport with constitutional requirement of due process."  *Id.* at

17

838 (emphasis in original).  Accordingly, the Court held that a defendant in a prosecution

18

pursuant to 8 U.S.C. § 1326 must be permitted to challenge the lawfulness of the prior

19

deportation.  *Id*.

20

In *Mendoza-Lopez*, the defendants were arrested and deported after a group hearing at

21

which they purportedly waived their rights to apply for suspension of deportation and to appeal.

22

*Id.* at 840.  They returned to this country, were once again arrested, and the government charged

23

them with a violation of 8 U.S.C. § 1326.  *Id.* at 831.  The underlying court found, and the

24

Supreme Court accepted as true, that the Immigration Judge failed to adequately explain the

25

defendants' right to suspension of deportation or their right to appeal.  *Id.* at 840.  The Supreme

26

Court then held that because the Immigration Judge "permitted waivers of the right to appeal that

were not the result of considered judgments by [defendants], and failed to advise [defendants] properly of their eligibility to apply for suspension of deportation . . . the violation of [defendants'] rights . . . amounted to a complete deprivation of judicial review." *Id.* at 841. Thus, the government would not be permitted to rely on that prior deportation order as reliable proof of an element of the § 1326 prosecution "[b]ecause [defendants] were deprived of their rights to appeal and of any basis to appeal since the only relief for which they would have been eligible was not adequately explained to them . . . ." *Id.* at 841, 843. The dismissal of the indictments against the defendants was required. *Id.* at 843.

In response to the holding of *Mendoza-Lopez*, Congress amended 8 U.S.C. § 1326 to explicitly provide for a three part test for when a defendant can collaterally challenge a prior deportation in a prosecution under section 1326:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) of this section or subsection (b) of this section unless the alien demonstrates that--
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). To prevail on a collateral attack to a prior deportation on grounds that the deportation proceedings were fundamentally flawed, the defendant must meet each prong of the three-part test. *See United States v. Pallares-Galan,* 359 F.3d 1088, 1095 (9th Cir. 2004) (citing 8 U.S.C. § 1326(d)).

If a defendant succeeds in this three part test to collaterally attack the predicate deportation order, the indictment against him must be dismissed. *See United States v. Lopez-Menera,* 542 F.Supp.2d 1025, 1027 (N.D. Cal. 2008); *United States v. Lopez-Hernandez*, 2007 WL 608111 (N.D.Cal. 2007); *United States v. Andrade-Partida*, 110 F.Supp.2d 1260, 1272 (N.D. Cal. 2000).

**B.    ENTRY OF THE DEPORTATION ORDER AGAINST MR. ROMERO-ROMERO WAS FUNDAMENTALLY UNFAIR (8 U.S.C. § 1326(D)(1))**

Here, Mr. Romero-Romero's collateral challenge to his 2004 deportation order meets each prong of this three-part test.  Because the first and second prongs are informed by the third, the below analysis begins with the third prong, *i.e.*, that the entry of the order was fundamentally unfair.  "An underlying removal order is 'fundamentally unfair' if (1) an alien's 'due process rights were violated by defects in the underlying deportation proceeding' and (2) 'he suffered prejudice as a result of the defects.'"  *Id.* (citing *United States v. Garcia-Martinez*, 228 F.3d 956, 960 (9th Cir. 2000)).

As detailed below, Mr. Romero-Romero's due process rights were violated by defects at his deportation proceedings and he suffered prejudice as a result of those defects.  Here, he is claiming two specific defects: (1) although he derived citizenship to the United States on May 30, 2006 when his mother naturalized, the IJ used the wrong standard for derivative citizenship and, as a result, unlawfully ordered the deportation of a citizen of the United States; and (2) his attorney provided constitutionally ineffective assistance of counsel by failing to conduct even a minimal investigation and by failing to file critical documents that he assured his client and the court he had filed.  As a result of each of these defects, Mr. Romero-Romero suffered prejudice, *i.e.,* he would not have been deported because he was a citizen of the United States.

      **1.    Mr. Romero-Romero's Due Process Rights Were Violated by the Defects in the Underlying Deportation Proceeding Because The IJ Considered The Wrong Legal Standard for Derivative Citizenship**

"The executive may deport certain aliens but has no authority to deport citizens."  *Rivera v. Ashcroft*, 394 F.3d 1129, 1136 (9th Cir. 2004) (overruled by statute on other grounds).  Thus, an entire deportation proceeding is called into doubt until a claim of citizenship is resolved.  *Id.* "Because the deportation of one who so claims to be a citizen obviously deprives him of liberty and may result also in loss of both property and life, or of all that makes life worth living," the deportation of any person with a non-frivolous claim to American citizenship without properly considering that claim violates the due process clause of the Fifth Amendment.  *See id.*  Here,

1   Mr. Romero-Romero's due process rights were violated because he was ordered deported from

2   the United States when he was – and is – a citizen of the United States.  He derived citizenship

3   from his mother on May 30, 1996 when she naturalized as a United States citizen.  IJ Peters,

4   however, misconstrued the derivative citizenship statue to require a different standard than that

5   required under the law.

6          Under the current derivative citizenship statute, Mr. Romero-Romero would be a citizen

7   of the United States.  That law, enacted as part of the Children Citizenship Act of 2000

8   (hereinafter "CCA"), 8 U.S.C. § 1431, provides that a child born outside of the United States

9   automatically becomes a citizen of the United States when: (1) at least one parent of the child is a

10  citizen of the United States, whether by birth or naturalization; (2) the child is under the age of

11  eighteen; and (3) the child is residing in the United States in the legal and physical custody of the

12  citizen parent pursuant to a lawful admission for permanent residence.  Because Mr. Romero-

13  Romero's mother naturalized when he was sixteen years old, and he had been residing in the

14  United States in the legal and physical custody of his mother as an LPR, he would be entitled to

15  citizenship under that section.  The Ninth Circuit has held, however, that the streamlined

16  derivative citizenship requirements of the CCA do not apply to those like Mr. Romero-Romero

17  who turned eighteen before February 27, 2001.  *See Hughes v. Ashcroft*, 255 F.3d 752, 760 (9th

18  Cir. 2001) ("the CCA granted automatic citizenship only to those children who were under the

19  age of 18, and who met the other criteria, on February 27, 2001.").  Rather, "derivative

20  citizenship is determined under the law in effect at time (sic) the critical events giving rise to

21  eligibility occurred."  *Minasyan v. Gonzalez*, 401 F.3d 1069, 1075 (9th Cir. 2004).

22          Thus, we look at the law that was in effect at the time Mr. Romero-Romero's mother

23  became a naturalized citizen in 1996.  *See id.*  Even under the more onerous standard of former

24  Immigration and Nationality Act § 321(a), 8 U.S.C. § 1432 (1996), *repealed by* Pub. L. 106-395,

25  Title I, § 103(a), October 30, 2000, Mr. Romero-Romero still meets the standard for derivative

26  citizenship.  That law provides, in pertinent part, that:

1   A child born outside of the United States of alien parents . . . becomes a citizen of the
    United States upon fulfillment of the following conditions:

2   * * *

3   (3) The naturalization of the parent having legal custody of the child when there has been
4   a legal separation of the parents . . . ; and if

5   (4) Such naturalization takes place while such child is under the age of eighteen years;
    and

6
7   (5) Such child is residing in the United States pursuant to a lawful admission for
    permanent residence at the time of . . . the parent naturalized under clause . . . (3) of this
    subsection . . . .

8   8 U.S.C. § 1432 (1996).

9       Mr. Romero-Romero meets all three requirements of § 1432.  He meets condition (4) as

10  his mother was naturalized in 1996, when he was sixteen years old.  He also meets condition (5)

11  because he became a lawful permanent resident in 1989, when he was eight years old.  He also

12  meets condition (3) because at the time of his mother' naturalization, his parents had legally

13  separated and he was in his mother's legal custody.  Nonetheless, at his immigration proceeding,

14  IJ Peters misconstrued the standard for legal separation and incorrectly advised Mr. Romero-

15  Romero that his parents had to be "divorced" to be eligible for derivative citizenship.  The

16  contrary was true: legal separation under the statute is not so limited, nor is it even limited to

17  court orders expressly titled "legal separation."  *Minasyan*, 401 F.3d at 1078.  Rather, "legal

18  separation" under the INA is guided by the law of the state with jurisdiction over the marriage in

19  question.  *Id.* at 1077.  Accordingly, we turn to California law, the state with jurisdiction over the

20  marriage.

21      In *Minasyan*, the Ninth Circuit examined this exact question and explained that California

22  law provides for three forms of separation: (1) divorce/dissolution of marriage; (2) legal

23  separation; and (3) separation by virtue of law.  *Id.* at 1078.  After "considering which of these

24  three forms of separation under California law constitute a legal separation for purposes of §

25  321(a) [8 U.S.C. § 1432(a)]," the Ninth Circuit concluded that it was the most expansive of these

26  three forms, a "separation by virtue of law" that "constitutes a legal separation for purposes of

1  the INA." *Id*.  The court explicitly determined that neither a divorce nor an order titled "legal

2  separation" was necessary (although both would be sufficient).  *Id*.  The court went on to

3  conclude that a separation by virtue of law occurs when spouses are "living separate and apart

4  and there ha[s] been a final rupture of the marital relationship."  *Id.* (internal citations and

5  quotations omitted).  The critical aspect of any such separation is the "date of the separation not

6  ... the date of a court order."  *Id*. at 1079.

7         Here, IJ Peters was incorrect about the standard for derivative citizenship.  She repeatedly

8  questioned Mr. Romero-Romero about whether his parents were "still married" or divorced and

9  was focused solely on those two options: married or divorced.  That, however, does not

10  accurately reflect the derivative citizenship standard.  Rather, Mr. Romero-Romero's parents

11  could be married and not divorced, yet he still could qualify for derivative citizenship if IJ Peters

12  determined they were separated by virtue of law, *i.e.,* if they were living separate and apart and

13  there had been a final rupture of the marital relationship.  The IJ misconstrued the standard under

14  the statute and deprived Mr. Romero-Romero of his opportunity to establish his derivative

15  citizenship under the correct standard.

16         During a deportation hearing, the requirement that the IJ inform an alien of any apparent

17  eligibility for relief from deportation and give the alien the opportunity to pursue that form of

18  relief is "mandatory."  *See United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000) (quoting

19  *United States v. Arce-Hernandez*, 163 F.3d 559, 565 (9th Cir. 1998)).  An erroneous

20  determination by an IJ that the alien is statutorily ineligible for relief from deportation also

21  constitutes a denial of due process.  *See United States v. Ubaldo-Figueroa,* 364 F.3d 1042, 1049-

22  50 (9th Cir. 2004) (an inaccurate statement that an alien is ineligible for any relief constitutes a

23  breach of the IJ's duty and a violation of due process).  Failure of the IJ to inform the defendant

24  of his eligibility for a waiver of deportation in the underlying proceedings establishes a violation

25  of due process in a collateral appeal in a case brought under 8 U.S.C. § 1326.  *See Arrieta*, 224

26  F.3d at 1079.  The failure of the IJ to advise an alien of his eligibility for a waiver of deportation

1  violates the alien's due process rights and "amount[s] to a complete deprivation of judicial

2  review of the determination." *Mendoza-Lopez*, 481 U.S. at 840.  "Even if the alien's eligibility is

3  not clearly disclosed in the record, the IJ has a duty to discuss discretionary relief with the alien

4  so long as the record as a whole raises a reasonable possibility of eligibility of such relief."

5  *Andrade-Partida*, 110 F.Supp.2d at 1268.

6  　　　Here, IJ Peters incorrectly informed Mr. Romero-Romero that his parents had to be

7  divorced in order for him to be eligible for derivative citizenship.  In fact, that was not the case,

8  and his parents' separation was sufficient to establish "legal separation" under the applicable

9  derivative citizenship statute.  *See Minasyan*, 401 F.3d at 1078-79 (9th Cir. 2004).  As both Mr.

10  Ventura and Ms. Romero have stated, as of 1992 when Mr. Ventura was deported from the

11  United States, they were living separate and apart and there had been a final rupture of the

12  marital relationship.  At that time, they had no intention of resuming marital relations.  Indeed,

13  Mr. Ventura had a child with another woman, and began living a life with his "new" family.

14  Moreover, IJ Peter's error is not excused by the fact that Mr. Romero-Romero had not yet

15  documented his citizenship.  "Because citizenship is transmitted automatically upon the parent's

16  naturalization, it does not depend on the filing of an application, an administrative decision, a

17  court order, an oath of allegiance, or any other procedure." *Minasyan*, 401 F.3d at n.10 (citing

18  INS Interp. § 320.1(a)(1)).  Mr. Romero-Romero automatically derived citizenship in 1996 when

19  his mother naturalized.  As such, IJ Peters order of deportation against him violated his due

20  process rights.

21  　　　**2.    Mr. Romero-Romero's Due Process Rights Were Also Violated by His**
   　　　**Attorney's Failure to Pursue His Derivative Citizenship Claim**

22

23  　　　In addition, Mr. Romero-Romero's due process rights were violated by his attorney's

24  ineffective assistance of counsel.  While there is no constitutional right to counsel in deportation

25  proceedings, *see Castro-Nuno v. INS*, 577 F.2d 577, 578 (9th Cir. 1978), due process must be

26  accorded.  *See United States v. Barraza-Leon*, 575 F.2d 218, 220 (9th Cir.1978). "Ineffective

assistance of counsel in a deportation proceeding is a denial of due process under the Fifth

1    Amendment if the proceeding was so fundamentally unfair that the alien was prevented from

2    reasonably presenting his case." *Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir. 1985).  Due

3    process challenges to deportation proceedings normally require a showing of prejudice.  *See Lata*

4    *v. INS*, 204 F.3d 1241, 1246 (9th Cir. 2000) (alien must show error and prejudice on ineffective

5    assistance claim); *see also Getachew v. INS*, 25 F.3d 841, 845 (9th Cir. 1994). "Prejudice is

6    found when the performance of counsel was so inadequate that it may have affected the outcome

7    of the proceedings." *Ortiz v. INS*, 179 F.3d 1148, 1153 (9th Cir. 1999).  However, there is a

8    presumption of prejudice where judicial review of the deportation was foreclosed by flaws in the

9    administrative proceedings.  *See United States v. Leon-Leon*, 35 F.3d 1428, 1431 (9th Cir. 1994)

10   ("The only circumstance under which we suggested no showing of prejudice was necessary was

11   'when the administrative proceedings were so flawed' that an effective judicial review of a

12   deportation, which might otherwise have been prevented, would be foreclosed.").

13       In examining claims of ineffective assistance of counsel as a due process violation, the

14   Ninth Circuit looks to Sixth Amendment right to counsel jurisprudence as a guide.  *See*

15   *Dearinger v. Reno*, 232 F.3d 1042 (9th Cir. 2000).  Counsel's dereliction of duties need not

16   deprive petitioner of any constitutional right to violate due process; only prejudicial ineffective

17   assistance of counsel need be shown.  *Id.*  (finding ineffective assistance from counsel's failure to

18   file timely petition for review even though there is no constitutional right to petition the federal

19   courts).

20       The Ninth Circuit has found ineffective assistance of counsel resulting in a due process

21   violation on many occasions.  For example, in *Singh v. Ashcroft*, 367 F.3d 1182 (9th Cir. 2004),

22   the court found prejudicial ineffective assistance where the attorney failed to file an appellate

23   brief under after the deadline had passed.  *Id.* at 1184.  When the attorney attempted to file the

24   brief late, it was returned by the BIA with instructions that it should be resubmitted with a

25   motion for consideration of a late-filed brief.  *Id.*  The attorney did not attempt to refile the brief

26   and did not inform his client of the communication from the BIA.  *Id.*  The Ninth Circuit

1   concluded that the attorney's actions constituted ineffective assistance of counsel. *Id.* at 1189-
2   90.

3       In *Castillo-Perez v. INS*, 212 F.3d 518, 526 (9th Cir. 2000), the court concluded that the
4   petitioner had stated a "clear and obvious case" of ineffective assistance from counsel's failure to
5   timely file an application for suspension of deportation in spite of telling the client that he had
6   done so. Prejudice clearly resulted because counsel's performance may have affected the
7   outcome and the court remanded for a new hearing so that petitioner could apply for suspension
8   of deportation. *Id*. at 528 & n.12. Even though the law had since changed, the court emphasized
9   that on remand the immigration court must apply the law as it existed at the time of the due
10  process violation from counsel's deficient performance, in order to protect petitioner's rights to
11  the same extent his attorney should have done in the first instance. *Id*. at 528.

12      Likewise, in *Dearinger v. Reno*, 232 F.3d 1042 (9th Cir. 2000), the court affirmed the
13  grant of a habeas corpus petition alleging ineffective assistance of counsel from his failure to file
14  a timely petition for review. This was a due process violation, according to the court, because the
15  error deprived petitioner of an appellate proceeding entirely. Prejudice was presumed as the
16  "'adversary process itself has been rendered presumptively unreliable'" and cannot be
17  "accord[ed] any presumption of reliability." *See id*. at 1045 (quoting *Roe v. Flores-Ortega*, 120
18  S.Ct. 1029, 1038 (2000) (finding ineffective assistance in failure to perfect appeal under Sixth
19  Amendment right to counsel)); *see also Lopez v. INS*, 184 F.3d 1097 (9th Cir. 1999) (allowing
20  tolling of 180-day time bar based on fraud and ineffective assistance by a non-lawyer "counsel"
21  who posed as an attorney).

22      In this case, Immigration Specialist Angela Bean has identified numerous errors made by
23  Mr. Myers that substantially prejudiced Mr. Romero-Romero. At the time of the hearing, "Mr.
24  Romero-Romero could have presented a claim to derivative citizenship based on his mother's
25  naturalization." *See* Declaration of Angela Bean (hereinafter "Bean Decl.") attached to Linker
26  Auth. Decl. as Exhibit J. "That Mr. Romero-Romero's parents did not have a legal separation

1    order at the time of his hearing did not preclude his citizenship claim." *Id*.  Rather, Mr. Myers

2    could have nonetheless presented his claim.

3         "At a minimum," Mr. Myers should have consulted with a family law attorney about how

4    the parents' separation would be considered under the law.  Mr. Myers stated on the record that

5    he knew that when Ms. Romero naturalized, Mr. Romero-Romero was an LPR, under 18 years of

6    age, in the sole custody of his mother, and his father had been deported from the United States.

7    He said to the IJ: "He was out of the country, he wasn't here with the family at all." *See*

8    Transcription of Immigration Hearing, Sept. 16, 2003, attached to Linker Auth. Decl. as Exhibit

9    L-2.  Certainly, that was enough to warrant at least a consultation with a family law specialist.

10        Moreover, and in Ms. Bean's professional experience "[p]erhaps most egregious is Mr.

11   Meyers' apparent failure to file a Form N-600 application for certificate of citizenship despite his

12   claim to the immigration court on October 8, 2003 that he had already done so."  See Bean Decl.,

13   attached to Linker Auth. Decl. as Exhibit J.  An N-600 application would be an acknowledgment

14   of derivative citizenship decided by the United States Citizenship and Immigration Services

15   (hereinafter "USCIS").  Moreover, derivative citizenship is not a discretionary benefit and

16   therefore his criminal record would not have been an impediment to approval.  *Id*.  A thorough

17   review of Mr. Romero-Romero's A-file, however, reveals that no such document was ever filed.

18   *Id*.  "Such an omission is not only a failure to represent Mr. Romero-Romero properly but also an

19   apparent misrepresentation to the immigration court." *Id*.

20        In addition, Mr. Myers failed to present Mr. Romero-Romero's citizenship claim in two

21   other available forms.  *Id*.  First, "he could have assisted Mr. Romero-Romero in applying for a

22   U.S. Passport." *Id*.  That would have been adjudicated by the Department of State, and was

23   another avenue to document his citizenship.  *Id*.  Yet, Mr. Myers failed to undertake this action.

24   Second, Mr. Myers could have sought to "terminate the removal proceedings directly, on the

25   ground that Mr. Romero-Romero was not an alien." *Id*.  IJ Peters was required to make an

26   independent determination of alienage, and Mr. Myers failure to present motion to terminate the

1   proceedings is especially problematic here because the immigration judge recognized that she

2   could not proceed if Mr. Meyers were able to present a prima facie case for U.S. citizenship,

3   thereby signaling to Mr. Myers that he could take action. *Id.* He still did nothing.

4        Finally, Mr. Myers failed in his duty to undertake even the most minimal investigation of

5   Mr. Romero-Romero's case. *See id.* Had he done such an investigation, it "would have made

6   apparent that Mr. Romero-Romero could present a *strong* citizenship claim." *Id.* (emphasis

7   added). In sum, Mr. Myers' performance was significantly deficient.

8        **3.    Mr. Romero-Romero Suffered Prejudice As a Result of These Defects**

9        To satisfy a showing of prejudice, an "alien does not have to show that he actually would

10  have been granted relief. Instead, he must only show that he had a 'plausible' ground for relief

11  from deportation." *See United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1050 (9th Cir. 2004)

12  (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000)). Although the Ninth

13  Circuit has not defined the term "plausible," "this standard would seem to encompass borderline

14  cases, perhaps even where the equities are in equipoise. Stated differently, it seems fair to

15  interpret this standard as granting defendants in illegal entry cases the benefit of the doubt, even

16  if they have a borderline claim of prejudice, as long as they establish that their deportation

17  proceeding was procedurally deficient." Wible, Brent S., *The Strange Afterlife of Section 212(c)*

18  *Relief: Collateral Attacks on Deportation Orders in Prosecutions for Illegal Reentry After St.*

19  *Cyr*, 19 GEO. IMMIGR. L.J. 455, 475 (Summer 2005). Thus, under applicable law, Mr. Romero-

20  Romero **need not** show that he actually would have been granted relief, or even that there was a

21  reasonable probability that he would have been granted relief. *See United States v. Muro-Inclan*,

22  249 F.3d 1180, 1184 (9th Cir. 2001). A showing of plausible or possible granting of relief is

23  sufficient.

24       Here, as explained above, there is little question that Mr. Romero-Romero was prejudiced

25  by the defects in his immigration proceeding: he had more than a plausible claim to relief;

26  indeed, as a result of the defects, a citizen of the United States was deported. There is no greater

1    prejudice.  Had the IJ properly construed the derivative citizenship statute, Mr. Romero-Romero

2    would have presented evidence that his parents had legally separated in 1992.  Specifically, his

3    mother would have testified and presented evidence that she and Mr. Ventura had separated in

4    1992.  She would have been able to testify that he had been arrested trying to smuggle another

5    woman into the United States, and that he had been having an affair with that woman.  She

6    would have been able to testify that this other woman, Ms. Torres, was pregnant with Mr.

7    Ventura's child, and that Ms. Torres gave birth to Mr. Ventura's child on September 10, 1991.

8    She would have testified that as of that date, there was a parting of ways with no present

9    intention of continuing the marital relationship.  In addition, three of Mr. Romero-Romero's

10   siblings were also present at his deportation hearing on January 9, 2004.  Any and all of them

11   also could have testified to this same information.  As such, Mr. Romero-Romero had *at least* a

12   plausible claim to derivative citizenship.

13          To compound the prejudice created by the IJ's defects, Mr. Romero-Romero also suffered

14   prejudice as a result of Mr. Myers' incompetent assistance.  Where an alien loses his right to

15   appeal through the action of his attorney, there is a presumption of prejudice because he was

16   completely deprived of the appellate proceeding.  *See Singh v. Ashcroft*, 367 F.3d 1182, 1189

17   (9th Cir. 2004).  As the Ninth Circuit explains,

18          [W]here an alien is prevented from filing an appeal in an immigration proceeding due to
             counsel's error, the error deprives the alien of the appellate proceeding entirely.  And . . .
19          this error mandates a presumption of prejudice because the adversary process itself has
             been rendered presumptively unreliable.
20
     *Singh*, 367 F.3d at 1189 (quoting *Dearinger*, 232 F.3d at 1045).  This presumption of prejudice
21
     can be rebutted only if the alien did not have plausible grounds for relief from deportation.  *See*
22
     *id*.  Here, the Court should presume prejudice because Mr. Romero-Romero lost his right to
23
     appeal in reliance on his attorneys misrepresentations, including his inaccurate statement that he
24
     had filed an N-600 on Mr. Romero-Romero's behalf.
25
            Regardless, even if this Court does not presume prejudice, Mr. Romero-Romero suffered
26
     actual prejudice from Mr. Myers incompetence.  Ms. Bean has identified three different avenues

1    to relief that Mr. Myers should have sought for Mr. Romero-Romero: (1) filing an N-600 with

2    the USCIS; (2) requesting a passport from the Department of State; and (3) seeking to terminate

3    the removal proceedings before IJ Peters.  *See* Bean Decl., attached to Linker Auth. Decl. as

4    Exhibit J.  Mr. Romero-Romero had a strong claim to derivative citizenship and it is more than

5    plausible that had Mr. Myers sought relief through any one of these avenues Mr. Romero-

6    Romero would have been granted citizenship, or at a minimum, avoided deportation.  Yet, Mr.

7    Myers did nothing.

8         Had Mr. Myers done even the most minimal investigation he would have learned about

9    Mr. Romero-Romero's parents separation in 1992.  Any competent immigration attorney would

10   have taken appropriate steps to conduct this basic investigation.  *See* Bean Decl., attached to

11   Linker Auth. Decl. as Exhibit J.  Indeed, even Mr. Myers himself said on the record that he was

12   going to talk with Mr. Romero-Romero's mom about the status of her marriage.  He never did

13   that.  Additionally, he said he was going to investigate what happened after Mr. Romero-

14   Romero's father was deported from the United States in 1992.  He never did that either.  Had he

15   done so, he would have learned that Mr. Romero-Romero's parents separated in 1992 and he

16   could have made, at a minimum, a prima facie claim to derivative citizenship.  In addition, *even*

17   *if* he thought that he needed an order from the court entitled "legal separation," which he did not,

18   had he asked Ms. Romero to file for such a petition, she would have done so.  Instead, Mr. Myers

19   wholly abandoned his role as Mr. Romero-Romero's advocate.  *See id.*

20        Moreover, Mr. Myers' failure to file an N-600 on Mr. Romero-Romero's behalf, as well

21   as his affirmative misstatement to the court that he had filed such a document when he had not,

22   further prejudiced Mr. Romero-Romero.  Had the N-600 been filed, it was more than plausible

23   that it would have been granted because he had a "strong" derivative citizenship claim.  *Id*.

24   Moreover, Mr. Romero-Romero would not stipulated to removal and waived his appeal had he

25   not relied on his counsel's statements about the continued validity of his N-600.  Mr. Romero-

26   Romero was substantially prejudiced by his attorney's deficient performance:  Mr. Myers' errors

1  completely prevented Mr. Romero-Romero from having a full and fair opportunity to have his

2  strong derivative citizenship claim considered by the IJ or the immigration service.

3      In short, Mr. Romero-Romero's circumstances at the time of his deportation proceeding

4  demonstrate that it was more than plausible that he would have obtained derivative citizenship

5  had IJ Peters not erred in the standard for derivative citizenship and had his attorney not provided

6  deficient representation.

7  **C.    AS MR. ROMERO-ROMERO WAS MIS-ADVISED BY THE IJ AND HIS ATTORNEY, HIS WAIVER OF APPEAL WAS NOT KNOWING AND INTELLIGENT AND HE WAS DENIED THE OPPORTUNITY FOR JUDICIAL REVIEW (8 U.S.C. § 1326(D)(1) AND (D)(2))**

8

9      **1.    If Mr. Romero-Romero Must Exhaust His Administration Remedies, Because His Waiver of Appeal was Not Knowing and Intelligent, He is Deemed to Have Exhausted his Administrative Remedies**

10

11      While 8 U.S.C. § 1326(d)(1) requires that an alien exhaust all administrative remedies

12  before a collateral attack will succeed, the Ninth Circuit has held that a similar statutory

13  exhaustion requirement did not apply where there was a non-frivolous claim to citizenship.

14  *Minasyan*, 401 F.3d at 1074-75 (holding that "the statutory administrative exhaustion

15  requirement of [8 U.S.A.] § 1252(d)(1) does not apply to a person with a non-frivolous claim to

16  U.S. citizenship even if he has previously been (illegally) deported by the government." (internal

17  quotations and citations omitted.)).  Because Mr. Romero-Romero's claim to citizenship is not

18  patently frivolous, he must be excused from the exhaustion requirement.

19      Even if this Court determines that Mr. Romero-Romero must meet the exhaustion

20  requirement of 8 U.S.C. § 1326(d)(1), the exhaustion requirement "cannot bar collateral review

21  of a deportation proceeding when the waiver of right to an administrative appeal did not comport

22  with due process." *Ubaldo-Figueroa*, 364 F.3d at 1048 (citing *United States v. Muro-Inclan*, 249

23  F.3d 1180, 1183-84 (9th Cir. 2001)). The Due Process Clause requires that an alien's waiver of

24  his right to appeal a deportation order be "considered and intelligent." *See id.* at 1049*; see also*

25  *Mendoza-Lopez*, 481 U.S. at 839.   An alien who is not advised of his rights cannot make a

26  "considered and intelligent" waiver, and is thus not subject to the exhaustion of administrative

1    remedies requirement of 8 U.S.C. § 1326(d).  *See Ubaldo-Figueroa*, 364 F.3d at 1049-50;

2    *Pallares*, 359 F.3d at 1096 ("Where 'the record contains an inference that the petitioner is

3    eligible for relief from deportation,' but the IJ fails to 'advise an alien of this possibility and give

4    him an opportunity to develop the issue,' we do not consider an alien's waiver of his right to

5    appeal his deportation order to be 'considered and intelligent.'") (citing *Muro-Inclan*, 249 F.3d at

6    1182) (remaining citations omitted.).  As such, under Ninth Circuit precedent, the undisputed

7    failure of the IJ or any immigration official to correctly advise Mr. Romero-Romero of his

8    eligibility for derivative citizenship – and the affirmative *mis-statement* of the standard for such

9    relief – excuses Mr. Romero-Romero from the administrative remedies exhaustion requirement

10   of his collateral attack under 8 U.S.C. § 1326(d)(1).  In addition, Mr. Romero-Romero's

11   reasonable reliance on his attorney's false statement to him and the immigration court that he had

12   filed an N-600, which would remain valid and subject to adjudication after his removal, further

13   excuses the exhaustion requirement.

14        **2.        Mr. Romero-Romero Was Deprived of An Opportunity for Judicial Review**

15        Because Mr. Romero-Romero has a non-frivolous claim to citizenship, he was similarly

16   deprived of an opportunity for judicial review based on the defects at his immigration hearing.

17   *See Rivera*, 394 F.3d at 1136.  It is not possible to "unintentionally relinquish U.S. citizenship[;]

18   [t]he Constitution does not permit American citizenship to be so easily shed." *Minasyan*, 401

19   F.3d at 1075 (internal quotations and citations omitted).  Indeed, an immigration judge is

20   obligated to advise an alien regarding apparent avenues for relief from deportation.  *See, e.g.,*

21   *Duran v. INS*, 756 F.2d 1338, 1341-42 (9th Cir.1985) (citing 8 C.F.R. § 242.17(a) (1984)).

22   When the IJ fails to so advise, the Ninth Circuit has held that aliens are deprived a meaningful

23   opportunity for judicial review.  *See, e.g, Pallares-Galan*, 359 F.3d at 1098 ("For the same

24   reasons [as those stated to find that Pallares' waiver of appeal was procedurally defective] we

25   hold that Pallares was deprived of a meaningful opportunity for judicial review"); *see also*

26   *Ubaldo-Figueroa*, 364 F.3d at 1050 (same); *see also Andrade-Partida*, 110 F. Supp at 1271

1   (finding that the IJ's failure to advise of section 212(c) relief deprived the alien of judicial

2   review).  Mr. Romero-Romero thus meets this prong of a collateral attack on his deportation

3   proceeding.  Moreover, Mr. Romero-Romero's relied on his attorney's inaccurate advise and

4   misinformation to waive his appeal and stipulate to removal further evidences the denial of his

5   meaningful opportunity for judicial review.

6                                    **IV.    CONCLUSION**

7           For the foregoing reasons, Mr. Romero-Romero respectfully requests that this Court

8   dismiss the indictment in the instant case.

9   Dated: June 11, 2008

10                                              Respectfully submitted,

11                                              BARRY J. PORTMAN
                                                Federal Public Defender
12
                                                        /s/
13
                                                JODI LINKER
14                                              Assistant Federal Public Defender

15

16

17

18

19

20

21

22

23

24

25

26